**Nicholas CALI et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 64 Civ. 750.**

United States District Court
S. D. New York.

Feb. 21, 1968.

Rudolph & Santana, New York City, for plaintiffs; Richard J. Danyko, Yonkers, N. Y., of counsel.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for the United States; David Paget, Alan Blumberg, Asst. U. S. Attys., of counsel.

## OPINION

HERLANDS, District Judge:

This case arises out of an accident on March 24, 1963 when Nicholas Cali, the plaintiff, then thirteen years old, fell from a structure on the obstacle or confidence course at Fort Dix, a United States Army installation located in New Jersey. He claims $50,000. damages. His mother, Mrs. Columba Cali, suing as co-plaintiff for medical expenses and loss of Nicholas' services, claims $50,000 damages.

Plaintiffs' claims are asserted under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 1402, 2401, and 2674. Counsel agree that New Jersey substantive law is applicable.

### Stipulated Facts

The formal pretrial order, filed February 9, 1966, stipulates that the following facts are "not in dispute":

"a. At all relevant times, the plaintiffs were residents of the Southern District of New York.

b. On or about March 24th, 1963, the plaintiff NICHOLAS CALI, then an infant aged 13 years, legally entered the premises of Fort Dix, New Jersey, a military facility of the defendant UNITED STATES, as a visitor.

c. On the afternoon of that day NICHOLAS CALI, accompanied by his parents; his older brother, then an Army Trainee; and his older sister, visited a regimental confidence course maintained by the defendant for the training of Army soldiers at Fort Dix.

d. The plaintiff, NICHOLAS CALI, climbed the 'Slide for Life', an obstacle on the course, by means of a ladder that was part of the obstacle. The 'Slide for Life' consists of a tower 19 or 20 feet high with a platform at the top; from the platform, sturdy rope slants downward on an angle to a point on the ground 46 feet from the base of the tower.

e. After reaching the platform, the plaintiff, NICHOLAS CALI, began to climb down the rope; during the descent, he fell to the ground.

f. The defendant refused to render medical assistance to the infant plaintiff, at the medical center on Fort Dix because of the child's civilian status.

g. That as a result of the fall herein, the infant plaintiff, NICHOLAS CALI, sustained a fracture of the right radius and ulna with the fracture extending through the radia epiphysis."

During the trial, it was stipulated that the sum of $612. represents the reasonable value of all medical and hospital expenses and services attributable to the accident (75).*

Virtually all of the other relevant facts are the subjects of conflicting testimony and inferences. The decision turns on questions of credibility.

### Facts Established by Fair Preponderance of Credible Evidence

The accident occurred under the circumstances now to be described.

Fort Dix contained an area called the confidence or obstacle course. Its dimensions were about 200 yards from east to west, and about 75 yards from north to south (548–551). The north side was open (549) while the three other sides were adjacent to wooded areas, each of which contained picnic grounds (549). The main picnic ground was encompassed within the southern wooded area (671).

The obstacle course, which was not enclosed (645), was an off limits area to the general public (644) and to anyone else who was not a trainee actually using the course under supervision (648–649). A trainee received training on the obstacle course at least twice (546–547) during an eight-week cycle of basic training. He was instructed before being permitted to use any of the obstacles.

The course contained twenty-three different obstacles, each separately numbered and named by signs, designed to teach and test a soldier's confidence in negotiating the obstacles. The obstacles are constructed of timber, logs, platforms, ropes and barbed wire (548–549, 552). None of the obstacles is enclosed.

Well-beaten paths and one established dirt road were on the course (551).

The particular obstacle involved in this case is one called Slide For Life. It was located in the furthermost northeast corner of the course (549, 550, 556, 668–669).

Slide For Life consisted of three vertical wooden ladders, each about twenty feet tall, leading to a platform. The rungs of the ladder were about two or two and one half feet apart (565). At one side of the elevated platform was a five or six foot structure to which sturdy ropes were attached. These ropes slanted downward at an angle to a point on the ground forty-six feet from the base of the ladders.

On the perimeter of the obstacle course were eight signs reading: "Off Limits To Unauthorized Personnel" (552, 553, 555, 556, 646). These signs measured eighteen inches from top to bottom, and twenty-four inches from side to side. The letters on the signs were two inches wide and were black on a white background (553, 557, 668). These signs were positioned into the ground by a single wooden stake (668).

In addition to these off limits signs there were signs identifying each obstacle. These identification signs were affixed into the ground by two stakes (553, 668). These signs named and numbered the respective obstacles near which they were placed (552, 554).

By virtue of its location at the extreme northeast portion of the course, two of the off limits signs on the perimeter of the course were within twenty feet of Slide For Life (555, 556, 646–647). The sign identifying that obstacle was within ten feet of it (554).

A regimental roving guard in a jeep patrolled the camp area, including the obstacle course. This patrolling was standard operating procedure in force on the day of the accident (640–644). The patrol had the duty, in accordance with

* References are to the pages of the transcript of the trial record.

instructions, to keep unauthorized personnel out of off limits areas (643, 659).

Francis L. Novack, the defendant's witness, gave credible and impressive testimony based on close personal knowledge over a long period of time concerning the structures and signs on the obstacle course, operating safety procedures, and the absence of children from the course,—all of which bear directly upon various critical issues of this case. His testimony is accepted as trustworthy in all respects.

Mr. Novack served at Fort Dix as a major for three years beginning in 1954 (545–546, 558). In that capacity, he visited the obstacle course many times (546, 547, 558). From 1958 to 1960, he served as the safety director at Camp Kilmer (545, 558, 626). From May 1960 to April 1967 (when he became the safety director at Fort Dix), he served as safety inspector at Fort Dix (545, 626, 637). He was specially trained for that position by virtue of extensive studies as well as experience (544, 628–630).

His testimony establishes the fact that, during the period from May 1960 to April 1967 when he was safety inspector at Fort Dix, his duties required him to conduct safety surveys and inspections of all facilities and activities at Fort Dix, including the obstacle course (551, 552) and to see to it that the off limits signs were properly posted (547–548, 626, 630, 639); that proper measures for the safety of the children of camp visitors were taken (631–632); that he inspected the off limits signs on the obstacle course (548, 551); and that the signs

previously described by him were on the course at all times (552, 660, 675, 676).

Mr. Novack's testimony is persuasive of the facts that he never saw any children on the obstacle course at any time, including Sundays, during the years that he was at Fort Dix (649–650); that his attention was never called to the use of any equipment on the obstacle course by children (653); and that the accident to Nicholas was the first one to children on the obstacle course that has ever been called to his attention (656).

While he cannot recall Sunday, March 24, 1963 as a specific day on which he looked at the obstacle course, he testified truthfully that in March, 1963 he worked five days a week and occasionally on weekends (633); and that he visited the course "many times on weekends" (634, 635). Sometimes on Sundays he would drive by the obstacle course; and on none of those occasions did he ever see any children in the area of the course (635–636). While "at some of the points" a roadway for cars was located from 300 to 1000 yards away from the course (636), he was able to testify that he remembered: "quite well, there were no children on the obstacle course" (636).

Through Mr. Novack, the defendant introduced ten photographs (Defendant's Exhibits C–1 to C–10) taken about a year after the accident, which however are fair and accurate representations of the conditions, including the off limits and identification signs, in existence on the course on the day of the accident (561–565, 633, 674–676).[1]

---

1. Exhibit C–1 pictures an off limits sign and an identification sign, both near Slide For Life. The off limits sign is about twenty feet from the front of the obstacle (567). The identification sign is about ten feet from the obstacle (567). The distance between the two signs is about ten feet (567).

Exhibits C–2, C–5, C–6 and C–7 show an off limits sign near the front of Slide For Life.

Exhibit C–3 is a photograph of the identification sign reading: "9 Slide For Life".

Exhibit C–4 indicates a number of signs identifying various obstacles.

Exhibit C–8 discloses a sign in front of Slide For Life identifying it.

Exhibit C–9 shows two off limits signs: one nearer Slide For Life than the other. The off limits sign toward the lefthand corner of the photograph faces southward. The main portion of the picnic area, where many of the picnickers would be, was south of the obstacle course (380,671). There were some off limits signs "on the other side of the obstacle course where people would come from

This opinion has thus far described the physical and structural features of the obstacle course and how it was customarily maintained and used prior to and on March 24, 1963. Now to be detailed are the particular circumstances leading to the accident.

On Sunday, March 24, 1963, Anthony Cali, Nicholas' older brother, was stationed at Fort Dix for basic training. On that day, Anthony was visited by his family consisting of his parents, Mr. & Mrs. Jack Cali, his sister Dorothy and his brother, Nicholas.

Nicholas, whose thirteenth birthday was four days before the day of the visit, was a junior high school student. His school grades showed him to be of average intelligence (316–317). He apparently was physically well developed (Plaintiffs' Exhibit 8).

The Cali family called for Anthony at the orderly room; picked him up in the family car; drove to a parking lot; unpacked foodstuffs and eating utensils; and proceeded by foot across fields to wooded picnic grounds where they and two friends of Anthony had lunch.

After the family and the two friends of Anthony finished lunch, Anthony told the group that he wanted to show them around on an inspection tour, specifically mentioning the obstacle course. All of them were interested. Anthony guided

them onto the obstacle course. They had to walk quite a distance from the picnic area until they reached the course. The obstacles themselves had not been visible from the picnic grounds.

The family and the two friends walked as a group through the course, Anthony acting as their guide. Nicholas was about eight feet ahead of the group but at all times within their sight and the call of their voice.

Nicholas climbed up the middle ladder of Slide For Life. None of the adults warned or directed Nicholas not to do that nor did they tell him to come down.

(Nicholas had previously climbed ropes in his gym class at Mark Twain Junior High School. When he had climbed ropes in school, mats were placed under the ropes to prevent injury in case of a fall.)

Nicholas reached the top of Slide For Life, went onto the platform, and started to decend by means of the slanting rope. He lost his grasp after sliding down a few feet because he had not wrapped his feet around the rope. He fell to the ground and fractured his right wrist.

■■ The plaintiffs' case as presented in court was designed to skirt the actual facts just summarized, by contriving a story that would dovetail into the controlling New Jersey law of negligence.[2]

---

the picnic area onto the obstacle course" (667).

Exhibit C–10 is an aerial view of the course looking south (566). This shows two off limits signs, one nearer Slide For Life than the other.

2. Counsel stipulated (17, 18, 537, 618, 794) that the New Jersey law applicable to this case is the same as that formulated in Restatement (Second), Torts (1965) Section 339 and as exemplified by McGill v. United States, 200 F.2d 873 (3d Cir. 1953), a leading case cited by both counsel during the trial (19, 535, 537). See W. Prosser, Law of Torts 375 et seq. (3d ed. 1964); 2 F. Harper and F. James, Law of Torts 1450 et seq. (1956); Note, The Attractive Nuisance Doctrine—Its Status in New Jersey, 8 Rutgers L.Rev. 378 (1954).

The Court has considered the evidence in terms of the particular youthful plaintiff in the particularized circumstances of the occasion giving rise to the claim. See Williams v. United States, 379 F.2d 719, 723 (5th Cir. 1967).

As to the age of the infant plaintiff, the Court regards as pertinent the comment in Restatement, supra, Appendix, p. 129 that "the age of the child is important only as it bears on whether he does, and can be expected to, realize the risk". Hoff v. Natural Refining Products Co., 38 N.J.Super. 222, 118 A.2d 714 (App.Div.1955).

The Court does not hold that the infant plaintiff is, because of his age and as a matter of law, not within the protection of the rule as formulated in Restatement, supra, and such cases as Hoff, supra, and McGill, supra. The Court

The obstacle course was off limits to unauthorized personnel. Anthony acted improperly when he took his family onto the obstacle course for a sightseeing tour. More serious is Anthony's and his parents' dereliction in permitting Nicholas to play on various obstacles, i. e., the log path and the swinging rope, and then to climb Slide For Life,—all in their immediate presence.

In the pretrial order the plaintiffs admitted that Nicholas *"accompanied* by his parents; his older brother, then an Army trainee; and his older sister, visited a regimental confidence course \* \* at Fort Dix". (Emphasis supplied). However, the plaintiffs realized that an admission that Nicholas had climbed Slide For Life in the presence of his parents and the other members of his family would be fatal to the plaintiffs' case. In order to escape the devastating implications of the truth, the story was concocted that there were no off limits signs on or about the obstacle course; that Nicholas ran away from the family just as they were about to enter the obstacle course; that whatever Nicholas thereafter did on the course was out of the family's sight and hearing; and that, until the accident happened (according to Mr. & Mrs. Cali) or until a few moments before it happened (according to Anthony), they did not know where Nicholas was or what he was doing.

Whatever sham facts supported their story were spuriously recalled by the Calis while details revelatory of the truth were either denied or not remembered.

■ The Court finds and concludes that the accident which is the basis of the plaintiffs' complaint was not caused by the defendant's negligence; that the defendant was not guilty of negligence with respect to the plaintiff Nicholas on March 24, 1963; that at no time prior to the use by Nicholas on that day was the obstacle course visited by children nor was any equipment on it, including specifically Slide For Life, used by children; that at all relevant times the defendant exercised reasonable care and prudence in maintaining and supervising the obstacle course and the equipment thereon, under all of the then prevailing circumstances, including the circumstances that trainees at Fort Dix would sometimes be visited by adults accompanied by minor children; that, on and before March 24, 1963, the defendant did not have actual or constructive knowledge or notice of children coming upon or using the obstacle course or any structures and equipment on it; that, on and before March 24, 1963, there was no condition in or structure on the obstacle course of which the defendant knew or should have known that involved any risk or danger of bodily harm to children; that Slide For Life was a stationary non-defective structure which presented a patently obvious risk and danger of bodily harm to anyone using it without first having had instruction; that, as a matter of fact, Nicholas was fully aware of and fully appreciated such danger and risk in climbing upon that obstacle and using its ropes to descend; that Mrs. Cali, the co-plaintiff, and her husband, were likewise fully aware of and realized such danger and risk; that notwithstanding such awareness and realization on the part of both plaintiffs, Nicholas proceeded to climb upon Slide For Life and then, after reaching the top platform, to attempt to descend by means of its slanting rope; that neither Mrs. Cali nor anyone

recognizes, as observed in *Hoff,* supra, 118 A.2d at 720, that an average 13-year old boy "is decidedly immature so far as his capacity for appreciation of hazard and exercise of good judgment in respect to personal safety is concerned". The Court has treated the question of whether the infant plaintiff actually realized the risk of injury as "purely one of fact" (*Hoff,* supra, 118 A.2d at 722); and the

Court has adopted the standard expounded in *Hoff,* supra, at 722–723.

Prosser, supra, 381–382 makes the point that where "the child is fully aware of the condition, understands and appreciates the risk which it carries, and is quite able to avoid it, he stands in no better position than any adult with similar knowledge and understanding".

else in the Cali family group, although she and they could do so, warned or attempted to dissuade or otherwise make any effort to prevent Nicholas from climbing upon and using Slide For Life; that the accident of which the plaintiffs complain was caused solely by the negligence of Nicholas, which was contributed to by his mother, the co-plaintiff; that the defendant proved by the fair weight of the credible evidence the affirmative defense of plaintiffs' negligence; and that the complaint should be dismissed as against both plaintiffs with prejudice.

The Court has arrived at the above findings and conclusions by resolving contradictory testimony on the basis of credibility. The Court has rejected, in major respects, the testimony of both plaintiffs and the three other members of their family who took the stand.

The credibility of the plaintiffs is shattered not only by an analysis of their testimony concerning the alleged conditions leading up to the accident and the alleged surrounding circumstances but also by the medical and related proofs that impugn both plaintiffs' veracity.

Moreover, the conduct and demeanor of the plaintiffs and their witnesses while on the stand left the Court with the clear and powerful impression that they were not to be believed.

The Court has been compelled to subject the testimony of all of the plaintiffs' witnesses to dissective scrutiny in order to separate the threads of fact from the enveloping prevarications.

■ The Court has considered some prior inconsistent statements—made under oath by the plaintiffs and their witnesses—not only for impeachment purposes but also for the purpose of affirmatively proving certain facts. In so doing, the Court has adopted the rationale of such cases as United States v. DeSisto, 329 F.2d 929, 932–934 (2nd Cir.), cert. denied 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964); United States v. Nuccio, 373 F.2d 168, 171–173 (2d Cir.), cert. denied 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); Taylor v. Baltimore & Ohio R. R., 344 F.2d 281, 283 (2nd Cir.), cert. denied 382 U.S. 831, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965); Hainsworth v. Associated Dry Goods, 340 F.2d 955, 956 (2nd Cir. 1965) (admission); Ohio Valley Electric Corp. v. General Electric Co., 244 F.Supp. 914, 954 (S.D.N.Y.1965). Cf. United States v. Castellana, 349 F.2d 264, 276 (2nd Cir. 1965), cert. denied 383 U.S. 928, 86 S.Ct. 935, 15 L.Ed.2d 847 (1966); United States v. Borelli, 336 F.2d 376, 391 n. 11 (2nd Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

The Court emphasizes, however, that even if such prior inconsistent statements are considered solely for impeachment purposes, the Court's finding and conclusion—that the plaintiffs have fatally failed to prove their case by a fair preponderance of the credible evidence—are overwhelmingly established by the record.

### Testimony of Plaintiff Nicholas Cali Considered

A. How the Accident Happened, according to Nicholas

Sometime between 10:30 A.M. and noon (12, 36–37), after the car had been parked, the Cali family walked from the parking lot "through the obstacle course to the picnic area" (25, 26). The course was located "between the parking lot and the picnic area" (23).

As the family walked across the obstacle course on the way to the picnic area (136, 138), Nicholas saw some of the obstacles, such as, a log running course, a swing and rope arrangement that resembled a goal post (136–137), and barbed wire "underneath" which he "crawled" (137).

Adults were on the course "looking around"; "young kids" of "all different ages" (139) were "playing there on the obstacle course on different objects" (26), "fooling around, swinging on the thing" (138), "running all over, like a playground there" (139).

The trees in the picnic area where they lunched (149) prevented them from seeing the Slide For Life (150). He was unable to estimate how far the obstacle course was from the picnic grounds (322).

It took from five to fifteen minutes to walk from the picnic grounds to the obstacle course (322), though he said it was "right next to" the picnic area (27).

After lunch, he and his family and Anthony's two friends "went for a walk * * * into the obstacle course" (27), while they were carrying the eating utensils back to the car (151-152). He is "positive" that they had not returned to the car before going onto the obstacle course (152) but that they were walking back to the car (155).

He is "positive" that Anthony did not take the family on a tour of the obstacle course (155).

When his attorney asked him who was with him when he went into the obstacle course after lunch, he countered with the question, "Who was with me personally?", and he then answered, "Well, I was running ahead" (27-28). He testified that he ran "ahead of everybody" (151); that he was "running away like a maniac" (165); that he did not know where he was running to (165-166); that he "wanted to try some of the junk" because he "saw everybody else on it." (151); that he "most likely" ran in a direction "opposite" to the direction where his parents were going (166); that there were "so many other kids running with" him (166); that the course was "like a big playland" (28-29); that he saw children of his age using the facilitites (28); that children were on the swinging rope, the running boards, and "on the ladder" of Slide For Life from which "they hopped down" (163, 189); that children "were on the other two" ladders of Slide For Life; and that he climbed up the middle ladder of Slide For Life while other children were "on the other two" "just around the bottom" (189).

He also testified that, after he had run away from his family (323), he jumped "on the different equipment" (28), first jumping on top of and running along a log path three feet off the ground (28-29, 322), and then swinging on a rope arrangement (323).

He then saw Slide For Life (29) and the ropes attached to it (335). He approached Slide For Life by crossing under the ropes (190). He did not see any off limits or identification signs (142, 188, 189).

According to his testimony, when he went on Slide For Life, his family was "way off to one side" (173), "not too far away" (174) but he does not remember how far behind him they were (161, 162).

When he looked at Slide For Life he did not regard it as dangerous (324). It "looked simple" (29), "easy" and "nothing" (32). It looked "just as easy" to climb as the ladder used at his home (173). He did not consider the ropes dangerous (309) nor the platform high (30, 32).

As he climbed the ladder, he "felt secure", like "climbing up any other ladder" (330). However, when he tried to get down by using the ladder, he "kept slipping off"; it all looked "very high" and "treacherous" and he "panicked" (32, 117, 179) and he "was out of" his "mind with fear" (182).

He, therefore, went over to the rope which "looked pretty simple" (178) and "the easier way" (33, 178, 179). But, after grabbing the rope and letting his feet swing off, he "didn't know how to" go down; he became scared (312, 313); his hands slipped, and he fell to the ground (34).

B.   Analysis of Nicholas' Testimony

Nicholas' facile manipulation of the facts is clearly discernible from the internal inconsistencies of his own testimony, the general unreliability of the character of his testimony and his manner of testifying, the contradictions between his testimony and that of various members of his family, and the conflict-

ing testimony of such neutral witnesses as his former and present gym teachers.

The following items are illustrative:

1. He testified that he and his family, while en route from the car parking lot to the picnic grounds, walked "through" and "across" the obstacle course. Anthony testified that they walked "alongside" (344, 352, 387, 394) and "adjacent" (346) to the obstacle course, while on the way to the picnic grounds. Mrs. Cali did not remember walking on the obstacle course at all until immediately prior to the accident (476–477, 484).

2. Nicholas testified that, while on the obstacle course en route to the picnic grounds, he crawled underneath barbed wire,—a statement that he then retracted (137).

3. Nicholas testified that, while en route with his family to the picnic grounds from the parking lot, he saw children playing on the obstacle course and with the equipment "like a playground" (139). Anthony, in his pretrial affidavit sworn to June 1, 1964, said that he did not remember seeing anyone using the obstacle course equipment (442). Mrs. Cali testified that she first saw children on the obstacle course after Nicholas' accident (494) and that she does not know whether they were playing on any of the obstacles (493). Jack Cali, using precisly the same words as Nicholas—"like a playground"—described the alleged activities of children on the obstacle course after the picnic (744). This is an attempt to custom-tailor the evidence to fall within the *McGill* case, where the trial court had found that the tower there had been used openly and notoriously "as a playground" (200 F. 2d at 874).

Mr. Novack's credible testimony was that children never frequented the obstacle course or used its equipment.

4. Nicholas testified that he is "positive" that, after lunch, they did not first return the luncheon paraphernalia to the car before going on the obstacle course but that after lunch they went for a walk on the obstacle course while carrying the eating utensils back to the car (151, 152, 155, 156, 279, 281). Mrs. Cali, Jack Cali, and Dorothy testified that the family had returned to the car and put the eating utensils away and only then did they go with Anthony to the obstacle course.

5. Nicholas' testimony—that he ran away from his family just when they entered the obstacle course and that his family was not around when he climbed Slide For Life—was contrived to fit the classic pattern of an "attractive nuisance" case. The four members of Nicholas' family gave testimony, either at the trial or in their pretrial depositions, that Anthony took all of them as a group onto the obstacle course where he conducted a guided tour. The pretrial order [para. 3(a) c] stipulates that Nicholas "accompanied by" his family "visited" the obstacle course. Mrs. Cali's pretrial deposition shows that she was about eight feet from Slide For Life when the accident happened. In his pretrial deposition, Jack Cali swore that he was present when Nicholas was talking to other children while they watched him doing some climbing (769).

6. Nicholas testified that he played on and with two obstacles,—a log running path and a swinging rope arrangement—before he climbed up Slide For Life (156, 158, 193). He could not recall where these log and rope obstacles were located on the obstacle course or in relation to Slide For Life (193–194) nor could he recall how the swinging rope obstacle was constructed (193). Anthony testified that he did not see Nicholas use any of the equipment on the obstacle course until he saw him on top of Slide For Life. Jack Cali testified that he did not see Nicholas on the logs or the swinging rope.

7. Nicholas testified that he did not see any signs on the obstacle course reading "Off Limits To Unauthorized Personnel" (26, 35, 38, 140, 188). The overwhelming weight of the credible evidence establishes that there were eight such signs on the perimeter of the course, two of which were near Slide For Life.

8. Nicholas testified that he did not see any sign identifying Slide For Life before he climbed on the obstacle. The overwhelming weight of the credible evidence establishes that there was such an identification sign near Slide For Life. Nicholas himself gave various versions as to whether he had seen the sign identifying Slide For Life. One version is that he saw the sign when he was at or approaching the slide (35, 140–141, 292). A second version is that he does not remember (293) because he paid no attention to signs (325). A third version is that he is "sure" (324) and "positive" (142, 189) that he did not see the sign (26, 189) until after the accident (293, 326–327) and that his first awareness of the sign occurred immediately after the accident when "they helped" him "catch" his "breath and started escorting" him (294). A fourth version is that he first saw the sign when he went back to the scene of the accident (289–290), a story that he then retracted (290). A fifth version is that he first saw the sign when he was shown pictures of the Slide For Life (142, 289, 291, 294, 296).

9. Nicholas was "positive" that Anthony did not take the family on a tour of the obstacle course after lunch (155, 282, 285, 288, 289, 320–321). This statement is belied by Nicholas' own pretrial deposition of July 31, 1964 wherein he swore that, after lunch, Anthony or one of his friends suggested that they "go to see the obstacle course" (283); that Anthony "started showing" them "around" (282); and they "were all on the obstacle course" (283). The four other members of the Cali family in their pretrial depositions (and Dorothy additionally in her trial testimony) testified that Anthony took them (including Nicholas) on a tour of the obstacle course after lunch.

10. Nicholas testified that, since the accident, he has restricted arm movement (112–113) and that he has stopped playing football (114, 126, 127, 198, 200, 222–223), baseball (128–130, 198), and all other sports (131, 135). This is flatly contradicted by his own pretrial deposition of July 31, 1964 (270) and by his former gym teacher, Mr. Dominick Iannacone, who testified that, in 1966, Nicholas climbed ropes up to a height of twenty-five feet (686), that he exercised on parallel bars (688) and suspended rings (687) and other apparatus (689–690), and that he does upside down balancing (688).

Nicholas testified that, after the accident, he simply demonstrated to his fellow Boy Scouts "how to hold the ax" (313) whereas his pretrial deposition shows that as a Boy Scout he used the ax to chop wood with his right hand (203).

Nicholas testified that he lifted weights "very little" (206). His former gym teacher, Mr. Iannacone, and his present gym teacher, Mr. Francis J. Tierney, Jr. testified that he spends most of his gym time "with the weights" (711).

Nicholas testified that he never used barbells as distinguished from dumbbells (211) and that he is "positive" that he did not lift weights exceeding forty pounds (208–212). Mr. Iannacone and Mr. Tierney testified that he used and uses barbells and that he lifts weights up to eighty pounds and more (681, 683, 712).

On the stand, Nicholas was alert, intelligent, well-poised and articulate. The Court closely observed his demeanor while testifying. In light of these factors and an analysis of his testimony, the Court regards his version of the facts as unworthy of belief. There were no innocent errors of recollection. The story told by him was contrived and fabricated in essential details.

*Testimony of Anthony Cali Considered:*

A. How the Accident Happened, according to Anthony

Anthony had been in the Army for two weeks by March 24, 1963 (337, 352). On Sunday the week before March 24, 1963 (361) and on March 24, 1963—both before the picnic lunch (347, 348–350, 393, 442) and after it (422, 442, 443)—

he saw children playing on the obstacle course.

After lunch, Anthony did not see Nicholas using any equipment on the obstacle course until the very moment when he espied Nicholas on top of Slide For Life (372, 410–412). Nicholas had run away from the family (372, 403–405, 408–409) which was several hundred feet away from Slide For Life when Nicholas fell (374, 412, 414). Anthony was too far away to prevent Nicholas from falling when Nicholas attempted to descend by sliding down the rope.

### B. Analysis of Anthony's Testimony

In an attempt to support Nicholas' story, he falsely portrayed the obstacle course as used by children; and he took the untenable position that Nicholas had run away from the family onto the obstacle course where Nicholas proceeded to climb upon Slide For Life unseen by the family and without their knowledge.

When closely examined, Anthony's testimony is a tangled web of inconsistencies and contradictions. Typifying his testimony are the following details:

1. He testified that, en route to the picnic grounds from the parking lot, he and the family walked "alongside" (344, 352, 387, 394) and "adjacent" (346) to the obstacle course and not on or through it (391). This is contradicted by his testimony that he walked "through" the course on the way to the picnic grounds (354–355).

2. He testified that, on March 24, 1963, he saw many children on the obstacle course playing with the equipment. This is contradicted by his pretrial affidavit, sworn to June 1, 1964, wherein he answered, "I don't remember, sir. I wasn't observing" in response to the question, "Did you see anyone using the confidence course equipment upon your arrival in the area?" (442).

3. Anthony gave four variant stories as to whether he spoke to his family about the obstacle course and whether he took them on a guided tour of the course.

(It will be recalled that Nicholas had testified that he was "positive" that Anthony did not take the family on a tour of the obstacle course [155, 282, 285, 288, 289, 320–321].)

One story was that he did not remember whether he had spoken to the family about going on the obstacle course or whether he had taken them for a tour of the place (370, 435–437, 439). A second story was that, while he wanted to show them around, he did not remember exactly what he wanted to show them (440–441). A third story was represented by his flat denial that he had taken them onto the obstacle course and had shown them around (401, 402, 404–405). The fourth—and true—story was indicated in his pretrial affidavit of June 1, 1964 wherein he swore that, after lunch, he showed his family around, adding: "We walked across the field toward the confidence course. The confidence course was approximately three or four hundred meters from the road. I wanted to show my parents what it was like during basic. I wanted to give them a tour of the entire area. So, we started to walk across the fields towards the confidence course." (431).

The pretrial order, as already noted, recites the stipulated fact that Anthony and his family visited the regimental confidence course.

The significance of the fact that Anthony had taken the family on a guided tour was evident to each and every one of the Calis. For that reason they tried to deny that there had been any talk about such a tour or that such a tour had taken place. It was natural that Anthony would want to show his folks around on this their first visit to Fort Dix. Of course, he should not have taken them onto the obstacle course which was off limits to unauthorized personnel. Nicholas did not run away while Anthony was taking the family, including Nicholas, on a tour of the obstacle course. Nicholas ascended Slide For Life in full view and in the immediate presence of the family.

4. Concerning the signs that read "Off Limits To Unauthorized Personnel", he gave three different stories. The first version was that he did not see any such signs on the course on March 24, 1963 (350, 351, 352, 355, 422, 453, 455, 772–773, 778, 779). The second version was that he saw "some signs" but he did not notice them (351). The third version was that, in June or July 1963— when the picture, Plaintiffs' Exhibit 2, was taken—such signs were there (449, 454); and it was stipulated, as well as testified to, that the same conditions shown on that picture also existed on March 24, 1963 (97–99, 448).

5. With respect to the signs identifying the obstacles, he gave a similar performance of inconsistent testimony. One story was that he did not see such signs on March 24, 1963 (350, 351, 352, 422, 453, 455). A second story was that he did not remember seeing such signs there that day (422, 463–464, 466). A third story was that he saw such signs there that day some hours after the accident (777).

6. He also testified that, about a week after the accident, he went to the obstacle course to take pictures (784). He then changed that testimony, saying that he had not gone there to take pictures (784).

It became clear why he did not take pictures despite the fact that he had gone there to take pictures: he admitted that when he visited the course a week after the accident he noticed "some" signs reading "Off Limits To Unauthorized Personnel" (one such sign being in front of Slide For Life) in addition to the identification signs (776, 786, 788–789).

7. He said that he knew Slide For Life "by the name" before March 24, 1963 (396); but he then changed that testimony, saying that, prior to the accident, he did not know what they called that obstacle (396–397).

The Court views Anthony's testimony as a transparent attempt to trim the evidence to meet the exigencies of the plaintiffs' case. His trial testimony was mendacious.

### Testimony of Co-Plaintiff Mrs. Columba Cali Considered

A. How the Accident Happened, according to Mrs. Cali

She testified that, after the picnic, the group went for a walk and were sightseeing (482, 484); that she "thought he [Nicholas] was with" the group (494); that she did not realize that Nicholas had left the group "until he fell" (483); that the first occasion she had to observe the obstacle course was after the accident (477); that she did not remember passing the course prior to the accident (476–477, 486) or walking on it after lunch (484); that she did not see Nicholas on the obstacle course until after the accident (492–493, 495); that she did not remember how far from Slide For Life she was when the accident happened (484, 485); that she first saw or noticed any children on the obstacle course only after the accident (494); that she did not know whether any of the children were playing on the obstacles (493); and that she saw no signs of any kind on or around the obstacle course (497).

B. Analysis of Mrs. Cali's Testimony

1. Like the other members of her family, Mrs. Cali was reluctant to admit that Anthony had taken all of them, including Nicholas, on a tour of the obstacle course. However, in her pretrial deposition of July 31, 1964, she swore that, after the picnic, they returned the luncheon paraphernalia to the parked car (497); that they as "a group" were "all walking together" (498) "in the grounds" (497); that they went over to the obstacle course (497), with Anthony leading them "to a particular place" (498).

2. Contrary to her trial testimony— that she did not remember walking on the obstacle course after lunch (484) and that she first saw Nicholas on the course only after the accident (492–493, 495)— she stated, in her pretrial deposition,

that she "would judge" that she was "about eight feet" away from Slide For Life when Nicholas fell (489–490). Confronted with this pretrial deposition, she asserted that she is "not sure if it was eight feet or a good distance away" (491).

3. After testifying squarely that she had not seen or noticed any children playing in the grounds until after the accident (494), she deliberately equivocated by testifying ambiguously that "there were an awful lot of people and children around" before and after the accident (494).

4. Defendant's pretrial interrogatory No. 10 had asked whether during the ten-year period prior to or at any time subsequent to March 24, 1963, Nicholas sustained any injury, illness or disability other than the results of the March 24, 1963 accident. Mrs. Cali's answer (signed October 5, 1965) was "No" (511-512, 521). This was false. Both she and Nicholas admitted under cross-examination that, subsequent to March 24, 1963, Nicholas had suffered the following three medical incidents: (1) In November or December 1964 he received a fracture at the base of the right thumb (Nicholas: 230–233, 237–240, 245, 314–315; Mrs. Cali: 499, 501); (2) Some time in 1965, he hurt his knee and right wrist as the result of a fall (Nicholas: 225–231, 243, 247–248; Mrs. Cali: 503); and (3) In the latter part of 1965, he had an operation on his left knee cap for a cyst or a calcium deposit (Nicholas: 249–252; Mrs. Cali: 505).

Mrs. Cali admitted that she had given her attorney the answer to the above-mentioned interrogatory (521). On redirect examination, when asked by her own attorney whether she knowingly had made a false or misleading answer, she twice answered, "I don't recall" (523, 524).

Her testimony is pervasively unreliable and incredible.

## Testimony of Dorothy Cali Considered

### A. How the Accident Happened, according to Dorothy

Dorothy, a twenty-one year old college student and a sister of Nicholas, was called as rebuttal witness in behalf of the plaintiffs. She testified that she first became aware of the accident when she saw Nicholas on the ground (731); that she saw signs identifying the various obstacles, including one reading "Slide For Life" (731); that she did not see any off limits signs (731, 733); that the off limits sign partially indicated on Plaintiffs' Exhibit C–2 was not there on March 24, 1963 (732); that on March 24, 1963 they were "just walking through" the obstacle course (732), "sort of back and forth" (734); that there were children "just all over" the obstacle course and "they were playing underneath and on top of them [these constructions] and all over" (733); that the Calis had returned the dishes to the car after lunch (735, 736) and then they "walked around" (736), "wherever" they "saw places" (737); and that Anthony did not take them through the area "because he didn't know his way either" (737).

### B. Analysis of Dorothy's Testimony

Contrary to her trial testimony, Dorothy's pretrial deposition of July 31, 1964 averred that after the picnic, Anthony "wanted to show" them "around the place" and he took the entire family to "the obstacle course" (738). She then attempted to qualify her pretrial testimony by questioning "the specific vocabulary" she had used and stating that she had not meant that Anthony had "lead" them "as such" as in "a guided tour" (740). She finally blurted out: "All right, my brother led us. We were with him and he was sort of guiding us around the area, but not like a guided tour." (741).

An interested and intelligent witness, she manifestly attempted to give a story

that was custom-tailored to fit the requirements of the plaintiffs' case. The Court finds her testimony unworthy of belief.

### Testimony of Jack Cali Considered

#### A. How the Accident Happened, according to Jack Cali

He testified that, after the picnic, they returned to the parked car to put the eating utensils away (746, 758); that they then took a walk (747) on a path that took them onto the obstacle course (759); that "nobody decided" that they should walk to the obstacle course (747); that he "wasn't interested in what he [Anthony] was doing, training" because he "just wanted to see if he [Anthony] was all right" (758); that he did not see any signs on the obstacle course (742, 743), even though he looked for signs "at the time" (752, 753); that he did not see Nicholas on any obstacles on the course, including Slide For Life (754, 755, 760); that he did not remember how far ahead of him Nicholas was on the course nor when Nicholas left his company (749, 751); that he thought Nicholas was with the family group (750); that he, while Nicholas was with him, saw other children (745) "running around" in the obstacle course and climbing "all over them things" "just like a playground" (743–744); and that he does not remember how far he was from Slide For Life when he heard Nicholas' scream (761).

#### B. Analysis of Jack Cali's Testimony

His testimony is permeated with prevarications and inconsistencies.

1. He testified that he looked for signs "at the time" (752). When asked what he meant by the expression "at the time", he switched to the explanation that he meant not "right away but afterwards" (753). When asked what he meant by "afterwards" he took refuge in the explanation that he does not know what he meant (753). This deliberate evasion was compounded by his testimony that "if there was any signs restricting any area there" he would have

called Nicholas out (752); and that he had asked his wife whether "there was anything like that around" (752). Realizing that this bit of testimony did not sound convincing even to himself, he interpolated that he did not know whether he had asked his wife that question (752).

In his efforts to bolster his testimony about looking for signs, he compromised himself further, first, by declaring that he had looked for signs "when I [he] seen [sic] all the kids there" (753) and then by stating that he thought "about this here sign business when I see the guards guarding the garbage disposal. I said, 'Why didn't they guard this area at the time'. \* \* \* I said, if they are guarding a place like that, why didn't they guard this?" (753).

2. His trial testimony—that nobody decided that they should visit the obstacle course and that he was not interested in Anthony's training (747, 758)—was willfully designed to conform to the trial testimony of the other members of his family in their studied effort to conceal the fact that all of them had visited the obstacle course as part of a tour conducted by Anthony.

In a verbal lapse, he said he had seen an identification sign by Slide For Life "when we passed this tour" (755).

His pretrial deposition of July 31, 1964 disclosed the true fact that they had been talking about Anthony's training; that Anthony had said he wanted to show him the "different obstacles" at the obstacle course (769) "where they train" (768, 770); and that Anthony then took them to the obstacle course (770–771).

3. Contrary to Nicholas' description of his alleged extensive use of various obstacles, Jack Cali testified that he did not see Nicholas playing on the swinging ropes nor did he see Nicholas on the log obstacle (754) nor did he see Nicholas on any other obstacle (755). The spurious fact sought to be established by the plaintiffs was that none of the family saw Nicholas use any of the apparatus, in-

cluding Slide For Life, until he was on top of the Slide or until after the accident happened. As part of that testimonial tactic, they testified that Nicholas had run away and was far distant or out of sight. Jack Cali tried to support that line of sham proof by his testimony that he did not remember how far ahead of him Nicholas was on the course; that he did not remember when Nicholas left his company (749); that he did not see Nicholas climb on Slide For Life (760); that he did not see Nicholas on the Slide (760); and that he does not know how far away he was from that obstacle when Nicholas fell (761).

On the other hand, Jack Cali also testified that he thought that Nicholas was with the group (750); that the family was together when he saw Nicholas on the obstacle course (754); that they were "not too far" away from Nicholas at the time (751); that he "couldn't say" that he was about ten or fifteen feet away from Nicholas when he saw him walking around on the course (751); that he does not remember (751) how far he was from Nicholas on the course. However, he said that he saw Nicholas run away because "he liked to kid around in the course over there" (750), adding that he meant that Nicholas was just "looking around and looking at them and he was talking to the other kids" (751); that "he was fooling around with the other boys in the place there" (760); and that Nicholas was with him at the time he saw other children (745) who were "running around" in the obstacle course and were "all over them things," "just like a playground" (743–744).

In his pretrial deposition of July 31, 1964, Jack Cali swore that he had not noticed Nicholas running around (770).

Thus, in describing the foregoing activities, Jack Cali placed himself together with Nicholas. His story was that, while other children were using the various obstacles "like a playground" and while Nicholas was "fooling around with the other boys", Nicholas did not use any of the obstacles (754, 755). However, in Jack Cali's pretrial deposition, he said that other youngsters were "watching him [Nicholas]. I mean they were doing some climbing too. I imagine they were. What they were doing—he was talking to them so I turned around, looked at him. I didn't say anything. I walked away, you know." (769).

Jack Cali's statement—that other children, who "were doing some climbing too", were "watching" Nicholas—coincides with Nicholas' testimony (163, 189) that, while he climbed up the middle ladder of Slide For Life, other children "were on the other two" ladders of Slide For Life.

The Court interprets Jack Cali's statement as meaning that he saw Nicholas doing "some climbing". That, in turn, could refer only to Slide For Life because —assuming that Nicholas had used the other obstacle consisting of ropes for swinging or the obstacle consisting of logs for running or jumping—these other obstacles did not entail climbing, which the ladders of Slide For Life certainly did. In sum, Jack Cali saw Nicholas climbing on Slide For Life while he was nearby but he "didn't say anything"; he "walked away".

### Plaintiffs' Photographs Considered

Like the twists and turns of plaintiffs' trial testimony and of their family-witnesses, plaintiffs' photographic exhibits (Exhs. 2–7) were taken in such a manner as to conceal rather than reveal the signs reading "Off Limits To Unauthorized Personnel". On none of these pictures is such a sign disclosed except to the limited extent that part of such a sign is illegibly shown on Exhibit 2. (See Anthony's conflicting testimony as to what this picture shows: 449; contra 450, 451, 454–455, 778, 781, 791.) These pictures were taken by Anthony or by one of his friends in his presence in June or July 1963. Anthony at that time knew that off limits signs were about the course and near Slide For Life. As already pointed out, he admitted that he

had come back to the course about a week after the accident to take pictures and, after he saw the off limits signs he did not take pictures (784, 776, 786, 788–789).

The plaintiffs' pictures, like their testimony, fall into the same pattern of prevarication and evasion.

### The Medical Testimony Considered

It may be appropriate, before concluding this opinion, to state for the record (though not material in light of the foregoing findings and conclusions) that the medical proofs show that Nicholas suffered from a fractured right wrist as a result of the accident; that he was in the Cross County Hospital from March 24, 1963 to April 2, 1963; that he suffered considerable pain and discomfort for about a week; that he was considerably disabled for six to eight weeks, wearing a cast until the early part of May 1963; that all disability attributable to the accident disappeared by October, 1963; and that Nicholas has not sustained any permanent injuries in any degree from the accident. The sum of $612. represents the stipulated reasonable value of all medical and hospital expenses attributable to the accident (75). If *arguendo* there had been liability on the defendant's part, damages for the pain, suffering, and discomfort suffered by Nicholas would be compensable in the amount of two thousand dollars.

Dr. Charles Steinman, called as a witness by the plaintiffs, testified that he had never X-rayed Nicholas' left arm nor had he ever seen any X-rays of the left arm (91–93). Had he done so, he would have discovered (as the defendant's doctor did) that Nicholas has a pre-existing congenital condition known as osteochondromata or exostosis in the right and left wrists and forearms. As a result of this condition, there are protuberances from the surface of the bones about one inch above the wrist and also at the upper ulna of the forearm (579–582, 589). This condition is not traumatic and was not affected by the accident (582–583, 603, 604). Whatever Nicholas complains about currently has nothing to do with the accident of March 24, 1963 (585, 603, 611).

The Court has accepted as reliable and accurate in all respects the medical testimony of the defendant's expert orthopedic surgeon, Dr. Bernard Jacobs (572 et seq.).

Finally, the Court points out that Nicholas and his family, with their characteristic lack of candor, did not tell their own doctor-witness, Dr. Steinman —who examined Nicholas on October 17, 1967 in the hallway of the courthouse preliminary to his testifying—about the three medical incidents that occurred subsequent to March 24, 1963 (249, 255).

\* \* \*

This opinion contains the findings and conclusions required by F.R.Civ.P. 52(a).

Judgment shall be entered dismissing the complaint on the merits with costs to the defendant.