**AQUA SLIDE 'N' DIVE CORPORATION, Petitioner,**

v.

**The CONSUMER PRODUCT SAFETY COMMISSION, Respondent.**

No. 76–1713.

United States Court of Appeals, Fifth Circuit.

March 3, 1978.

---

Jack L. Coke, Jr., Dallas, Tex., for petitioner.

Joseph E. Casson, Christopher Smith, Washington, D. C., for amicus curiae Anthony Industries, Inc.

John R. Fleder, Charles R. McConachie, Attys., Consumer Affairs Section, Antitrust Div., U. S. Dept. of Justice, Michael A. Brown, David Schmeltzer, Margaret A. Freeston, Alan H. Schoem, Phillip E. Bechtel, Attys., Consumer Product Safety Comm., Washington, D. C., for respondent.

Harold A. Jewett, Washington, D. C., for amicus curiae in behalf of public interest.

Before WISDOM, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

In this proceeding for review authorized by the Consumer Product Safety Act, 15 U.S.C.A. §§ 2051 *et seq.*, Aqua Slide 'N' Dive Corporation, an interested manufacturer, challenges the legality of a "Safety Standard for Swimming Pool Slides" adopted by the Consumer Product Safety Commission. 41 Fed.Reg. 2742 (1976) (codified in 16 C.F.R. § 1207 (1977)).

The primary issue is whether substantial evidence supports the Commission's finding,

required by statute, that this standard is "reasonably necessary to eliminate or reduce an unreasonable risk of injury." § 2058(c)(2)(A). The Commission demonstrated that adults who slide into the water headfirst encounter a one in 10 million risk of spinal injury and paralysis. The Commission, however, has only an untested theory to support its conclusion that the warnings required by the standard to be affixed to slides will actually reduce such injuries, and has failed to produce adequate evidence to show the chain required by the standard to be fixed to the slide ladder will avert drownings which might result from the installation of slides in deep water, and has further failed to consider adequately the effect of these standards on slide purchasers. Accordingly, we grant the petition for review and set aside challenged sections of the standard relating to warning signs, a ladder chain, and installation instructions.

## I. Introduction

Congress created the Consumer Product Safety Commission, an independent regulatory agency, in 1972. Among the purposes of the Commission are protection of the public "against unreasonable risks of injury associated with consumer products" and assistance to consumers "in evaluating the comparative safety" of such products. § 2051(b)(1), (2).

This case involves the Commission's first exercise of its power under the Act to promulgate standards to ensure that manufactured products are safe for consumer use. §§ 2056, 2058. The statute provides a detailed scheme governing the adoption of such a standard. Any interested person may petition the Commission to adopt a standard and may resort to judicial remedies if the Commission denies the petition. § 2059. The Commission itself can begin a proceeding to develop such a standard by publishing in the Federal Register a notice inviting "any person" to submit an offer to do the development. § 2056(b). Within the constraints of specified time limits extenda-

ble for good cause, the Commission can then accept such an offer, evaluate the suggestions submitted, and publish a proposed rule. § 2056. The actual promulgation of the final standard is subject to notice and comment provisions of the Administrative Procedure Act, 5 U.S.C.A. § 553, with the added provision that "an opportunity for the oral presentation of data, views or arguments" is to be given interested persons. 15 U.S.C.A. § 2058(a)(2).

The statute specifies the kinds of requirements a standard may impose, and provides that they must be "reasonably necessary to prevent or reduce an unreasonable risk of injury associated with [a consumer] product." § 2056(a). The Act also specifies certain findings the Commission must make in any rule. § 2058(c). Judicial review lies in the Court of Appeals, where the required findings must be "supported by substantial evidence on the record taken as a whole." § 2060(c).

The penalty provisions of the Act make it unlawful to "manufacture for sale, offer for sale, distribute in commerce, or import into the United States" a consumer product which does not conform to an applicable standard. § 2069(a)(1). Violators are subject to civil penalties, § 2069, criminal penalties, § 2070, injunctive enforcement and seizure, § 2071, private suits for damages, § 2072, and private suits for injunctive relief, § 2073.

The Act took effect in late 1972. In mid-1973 both a trade association known as the National Swimming Pool Institute and the plaintiff in this action, Aqua Slide, petitioned the Commission under § 2059 seeking promulgation of a safety standard for swimming pool slides. Aqua Slide's admitted motive was to prevent a product ban or forced repurchase threatened by the Bureau of Product Safety, a predecessor of the Commission, acting under either the Federal Hazardous Substance Act or the Child Protection and Toy Safety Act, codified together in 15 U.S.C.A. §§ 1261 et seq. As the manufacturer of 95% of the 350,000

swimming pool slides presently in use in the United States, Aqua Slide had a substantial interest at stake in the proposed regulatory action.

The Commission granted the petition and sought offers to develop the requested standard. When no suitable offers were forthcoming, it published a second solicitation, and, in January 1975, accepted an offer made by NSPI. The Institute appointed a committee and hired an engineering consultant, Weiner Associates, Inc., to assist it. Members of the committee included two pool builders, an orthopedic surgeon specializing in sports injuries, the president of Aqua Slide, a recreational safety specialist with the National Safety Council, a representative of the American National Red Cross, the head of the consultants division of the American Society of Safety Engineers, a consumer spokesman, an engineering professor, a behavioral science researcher for the Navy, and the sports editor of a newspaper. App. 843, 1587–1589. The Institute submitted the result of their efforts to the Commission in May 1975. The NSPI proposal sought to prevent slide injuries by specifying that slides must impart a low angle of attack into the water, by requiring manufacturers to include warning signs on new slides, and by limiting installation of large slides to water more than four feet deep. Because of a perceived danger of drowning in deep water, the Institute recommended a ladder chain device to warn children to stay off large slides.

The Commission modified the Institute's proposal in several respects. It rewrote the warning signs, and included a specific mention of the danger of paralysis. The signs, as depicted in 16 C.F.R. § 1207.7 (1977) read:

FIG. R
SIGN ON TOP STEP

LOOK OUT FOR PEOPLE AND OBJECTS BELOW
• ONE PERSON ONLY •

FIG. S
SIGN ON SECOND STEP DOWN

FIG. T
SIGN ON THIRD STEP DOWN

FIG U
SIGN ON TRANSOM FOR SLIDES PLACED IN WATER LESS THAN 4 FT DEEP

FIG V
SIGN ON TRANSOM FOR SLIDES PLACED IN 4 FT. OF WATER OR DEEPER

The Commission decided it did not have jurisdiction to regulate slide installation, and so it substituted required instructions which recommended appropriate installation depths. 16 C.F.R. § 1207.6. The ladder chain provision, however, remained mandatory. 16 C.F.R. § 1207.6(b)(2)(iv)(C). The Commission published its proposed rule on September 15, 1975. An oral proceeding took place in Washington, D. C., on October 10. Aqua Slide did not participate, and during the course of the comment period, which closed on October 15, submitted only a brief written criticism of the rule. Aqua Slide did, however, join in comments made by the Institute, of which it is a member.

At the time it published the proposed rule, the Commission expressed dissatisfaction with the economic impact data then before it. *See* 40 Fed.Reg. 42562, 42572 (1975). The Commission hired Battelle Columbus Laboratories, a private consulting firm, to do the necessary research. Battelle did not submit its report until October 30, two weeks after the period for public comment on the standard had closed. The Commission did not produce its views concerning economic impact until November 12. On January 19, 1976 the Commission promulgated the final rule.

Aqua Slide brought a timely petition for review to this Court. The Court denied Aqua Slide's motion to stay enforcement and the standard became effective on July 17, 1976.

## II. *Standard of Review*

 The standard of review—substantial evidence on the record taken as a whole—is easily stated, but its application to the informal record allowed by this Act poses novel questions for which existing case law provides no clear answer. Scalia & Goodman, *Procedural Aspects of the Consumer Product Safety Act,* 20 U.C.L.A.L.Rev. 899, 933–936 (1973). Congress put the substantial evidence test in the statute because it wanted the courts to scrutinize the Commission's actions more closely than an "arbitrary and capricious" standard would allow. H.R.Rep.No.92–1153, 92d Cong., 2d Sess. 38 (1972); S.Rep.No.92–749, 92d Cong., 2d Sess. 35 (1972); 118 Cong.Rec. 31378 (1972) (remarks of Cong. Moss). The substantial evidence test is used to assess the weight of a factual finding. *See Superior Oil Co. v. FERC,* 563 F.2d 191 (5th Cir. 1977). As a general rule, substantial evidence review is applied in connection with a formal hearing, at which an unbiased officer presides, rules of evidence apply, and parties may both subpoena and cross-examine witnesses. *Automotive Parts & Accessories Ass'n v. Boyd,* 132 U.S.App.D.C. 200, 207, 407 F.2d 330, 337 (1968); *Tidewater Express Lines,*

*Inc. v. United States,* 281 F.Supp. 995, 996 (D.C.1968); Verkuil, *Judicial Review of Informal Rulemaking,* 60 Va.L.Rev. 185, 212 (1974). *See* 5 U.S.C.A. §§ 556, 557. *Contra, Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (dictum). In writing this Act, however, Congress, desiring to streamline the Commission's hearing process, rejected the formal hearing requirement, provided for informal procedures under 5 U.S.C.A. § 553, and adopted a definition of record which encompasses both "any written submission of interested parties" and "any . . . information which the Commission considers relevant." §§ 2058(a)(2), 2060(a). The result is a legislative anomaly. Congress has mandated that the courts take a harder look, but has provided for a record whose volume, technical complexity, and remote relationship to the actual decision-making process of the agency impede clear vision. *See Seaboard Coast Line R.R. v. Coleman,* 562 F.2d 1008, 1010–1011 (5th Cir. 1977). The record in this case is a jumble of letters, advertisements, comments, drafts, reports, and publications which runs for almost 2,000 pages. It has no index. A reviewing court must either "scour the four corners of the record to find [the] evidence for itself," *Ethyl Corp. v. EPA,* 176 U.S. App.D.C. 373, 439, 541 F.2d 1, 67 (1976) (Bazelon, J. concurring), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), or rely exclusively on citations provided by counsel, *Texas v. EPA,* 499 F.2d 289, 297 & n.8 (5th Cir. 1974), *cert. denied,* 427 U.S. 905, 96 S.Ct. 3191, 49 L.Ed.2d 1199 (1976). Except for the brief statement of basis and purpose accompanying the promulgated rule, there is little indication of the relative weight given to various documents by the Commission. The Commission's reliance on the Institute, the Institute's deference to its consultant, Weiner, and the Commission's use of yet another consultant, Battelle, make the actual thread of reasoning relied on by the agency even more difficult to follow. *See Texas, supra,* 499 F.2d at 321–322 (Clark, J. concurring);

see *generally* D. Guttman & B. Willner, *The Shadow Government* (1976).

■ In this context, the duty of the Court to discern "substantial evidence on the record as a whole" requires a look at both substance and procedure. While the ultimate question is whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), the inability of any court to weigh diverse technical data also demands an inquiry to determine whether the Commission "carried out [its] essentially legislative task in a manner reasonable under the state of the record before [it]." *Florida Peach Growers Ass'n v. United States Dep't of Labor,* 489 F.2d 120, 129 (5th Cir. 1974).

■ The task of review first requires a look to the statute and legislative intent to determine the criteria necessary to establish the required findings. Then the relevant portions of the record must be ascertained, primarily by reference to pages cited by the parties. Both the facts which detract from the agency position as well as those which support it are to be considered. *Universal Camera v. NLRB,* 340 U.S. 474, 478, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The manner in which the Commission has acted is important, not only because § 553 procedural rules apply, but also because Commission procedure above and beyond those rules has a vital influence on judicial weighing of record facts. For example, the Court will defer to Commission fact-finding expertise, but it can do so only when the record shows the Commission has made an actual judgment concerning the significance of the evidence. *See* Pedersen, *Formal Records and Informal Rulemaking,* 85 Yale L.J. 38, 61 (1975). Also, the extent to which data and views in the record have been exposed to public comment will affect their reliability. Technical studies which have survived scrutiny of the scientific community and the public provide sounder footing for an inexpert judiciary to base its decision on than do facts which first see the light of day in a court proceeding. *International Harvester Co. v. Ruckelshaus,* 155 U.S.App.D.C. 411, 448, 478 F.2d 615, 652 (1973) (Bazelon, J. concurring). A bias in favor of information exposed to comment is particularly appropriate in a review proceeding under this Act, because Congress intended for the Act to maximize public participation. *See* H.R. Rep.No.1153, 92d Cong., 2d Sess. 37 (1972). After taking procedure into account and weighing the evidence, the Court must determine whether the established facts reasonably satisfy the criteria necessary to support the ultimate statutory finding. If they do, then the Commission has sustained its burden of adducing "substantial evidence on the record as a whole" for its finding. *See International Harvester, supra,* 155 U.S.App.D.C. at 444, 478 F.2d at 648.

■ The Government argues the substantial evidence test, while it applies to the overall determination that a standard is "reasonably necessary," § 2058(c)(2)(A), does not apply to the individual provisions, such as warning signs and ladder chains. The legislative history on which the Government relies does not speak to this point. *See* H.Rep.1153, 92d Cong., 2d Sess. 38 (1972). The distinction is not supported by the Act, which says "[a]ny requirement of such a standard shall be reasonably necessary to prevent or reduce an unreasonable risk of injury." § 2056(a). Logically, if any part of a standard is not "reasonably necessary," then the whole fails the statutory requirement unless the offending parts are set aside.

### III. *"Reasonable Necessity"*

The Act requires a finding that the standard is "reasonably necessary to eliminate or reduce an unreasonable risk of injury." § 2058(c)(2)(A). Aqua Slide argues that substantial evidence does not support the Commission's conclusion, 16 C.F.R. § 1207.-1(b)(6), that this standard is "reasonably necessary," in two particulars: (i) the warning signs have not been tested, may not work, and may be so explicit as to deter slide use unnecessarily, (ii) the ladder chain has not been shown effective.

■ The Government argues Aqua Slide has waived its right to raise certain questions concerning the warning sign to this Court because it did not first present them fully to the Commission, and did not participate in the oral hearing. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S. App.D.C. 308, 327, 486 F.2d 375, 394 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); *Pedersen, supra,* 85 Yale L.J. at 76. In a written comment to the Commission, however, Aqua Slide said the signs were "ill-conceived and not backed up by a substantial technical rationale and economic information" or "minimal testing." App. 1844–1845. While skimpy, these objections were sufficient to apprise the Commission of Aqua Slide's basic position, a conclusion which is buttressed by the Commission's response to them in the preamble to the final standard. *See* 41 Fed.Reg. 2742, 2746.

■ The Act does not define the term "reasonably necessary," and apparently Congress intended the Commission and the courts to work out a definition on a case-by-case basis. H.R.Rep.No.1153, 92d Cong., 2d Sess. 33 (1972). The legislative history, and the holdings of other cases decided under similar statutes, do discuss the meaning of "unreasonable risk," and indicate that term is interrelated with the "reasonably necessary" requirement. The necessity for the standard depends upon the nature of the risk, and the reasonableness of the risk is a function of the burden a standard would impose on a user of the product.

■ In *Forester v. Consumer Product Safety Commission,* 182 U.S.App.D.C. 774, 559 F.2d 774 (1977), the D.C. Circuit defined "unreasonable risk" in the Federal Hazardous Substances Act, 15 U.S.C.A. § 1261(s), as involving

a balancing test like that familiar in tort law: The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the harm the regulation itself imposes upon manufacturers and consumers.

At 168, 559 F.2d at 789 (footnote omitted). In this case, the legislative history specifies the costs to consumers that are to be considered: increases in price, decreased availability of a product, and also reductions in product usefulness. *See, e. g.,* H.R.Rep.No. 1153, 92d Cong., 2d Sess. 33 (1972). Implicit in this analysis is an understanding that the regulation is a feasible method of reducing the risk. *Forester, supra,* at 168, 559 F.2d at 789 n.21. As the House Committee Report on the Consumer Product Safety Act put it, "Of course, no standard would be expected to impose added costs or inconvenience to the consumer unless there is reasonable assurance that the frequency or severity of injuries or illnesses will be reduced." H.R.Rep.No.1153, *supra; see* Kimble, Federal Consumer Product Safety Act § 94 (1975). Also, an important predicate to Commission action is that consumers be unaware of either the severity, frequency, or ways of avoiding the risk. If consumers have accurate information, and still choose to incur the risk, then their judgment may well be reasonable. *See* Kimble, *supra,* § 94 (Supp.1977) (quoting speech by Commissioner Pittle); *see generally* S.Rep.No.749, 92d Cong., 2d Sess. 6, 14–15 (1972); Note, *The Consumer Product Safety Commission: In Search of a Regulatory Pattern,* 12 Colum. J.L. & Soc.Prob. 393, 401–412 (1976); Note, *The Consumer Product Safety Act: Risk Classification and Products Liability,* 8 Ind. L.Rev. 846, 849–852 (1975) (citing cases and materials elaborating definition of "unreasonable risk"). *Cf.* 16 C.F.R. § 1009.8 (1977) (Commission's statement of priorities).

■ The Senate Report provides an example of the kind of analysis Congress had in mind. It said a sharp knife might pose a reasonable risk of injury, because dulling the blade to make it safe would also make it useless. A sharp knife in a child's silverware set, however, might be unreasonable. S.Rep.749, *supra* at 6–7. In the *Forester* case, the D.C. Circuit found the Commission failed to show the risk of protrusions on a bicycle frame was unreasonable because it had not considered the extent to which a

regulation which banned the protrusions would impair the bicycle's utility. *Forester, supra,* 182 U.S.App.D.C. at 169–170, 559 F.2d at 790–791. In *Clever Idea Company v. Consumer Product Safety Commission,* 385 F.Supp. 688, 694 (E.D.N.Y.1974), another Federal Hazardous Substances Act case, the Commission failed to prove a risk of injury from plastic toy mouthpieces was unreasonable. There the risk was never shown to exist. No injuries had been reported, and the Commission's simulated "bite test" was not shown reliable. The Commission does not have to conduct an elaborate cost-benefit analysis. H.R.Rep. No.1153, *supra.* It does, however, have to shoulder the burden of examining the relevant factors and producing substantial evidence to support its conclusion that they weigh in favor of the standard.

In this case, the severity of the risk is so terrible that virtually any standard which actually promised to reduce it would seem to be "reasonably necessary." Both the Commission and the Institute concentrated their fact-gathering efforts on an attempt to identify the precise nature of the risk. After surveying slide accidents, App. 23–29, 37–42, 523–579, 1131, and considering the result of scientific studies of slide dynamics, App. 37–42, 266–313, the Commission identified a risk of "quadriplegia and paraplegia resulting from users (primarily adults using the swimming pool slide for the first time) sliding down the slide in a head first position and striking the bottom of the pool." 16 C.F.R. § 1207.1(b)(1) (1977). The risk is greater than an inexperienced "belly-slider" would anticipate, because improper head-first entry can cause an uncontrollable "snap rotation of the body" that "allows the arms to clear the bottom prior to head impact." App. 41, 389, 700–701. Also, a curved slide can disorient persons who are using it for the first time. App. 391–392. Without question, paraplegia is a horrible injury. *See Warner v. City of Bay St. Louis,* 552 F.2d 583 (5th Cir. 1977) (16-year-old boy paralyzed in diving accident).

■ The risk of paraplegia from swimming pool slides, however, is extremely remote. More than 350,000 slides are in use, yet the Commission could find no more than 11 instances of paraplegia over a six-year period. According to Institute figures, the risk, for slide users, is about one in 10 million, less than the risk an average person has of being killed by lightning. App. 583. The standard faces an initial difficulty because it is not easy to predict where paraplegia will next occur, and to burden all slide manufacturers, users, and owners with requirements that will only benefit a very few, is questionable. Remote risks have been found "unreasonable," but the context was one in which the safety standard promised to eliminate the danger entirely. *United States v. General Motors Corp.,* 183 U.S. App.D.C. 30, 561 F.2d 923 (1977) (risk of Cadillac steering defect unreasonable under National Traffic & Motor Vehicle Safety Act of 1966, 15 U.S.C.A. § 1391(1)), *petition for cert. filed,* 46 U.S.L.W. 3262 (Oct. 18, 1976); *United States v. General Motors Corp.,* 417 F.Supp. 933 (D.D.C.1976) (risk of carburetor fire); *see Bunny Bear v. Peterson,* 473 F.2d 1002 (1st Cir. 1973) (risk of crib mattress fires, Flammable Fabrics Act, 15 U.S.C.A. § 1193). Aqua Slide argues that, because of the low frequency, this Court should hold the risk to be "reasonable" and set aside the entire standard, including the slide construction specifications to which it does not otherwise object. Given the severity of the injury, however, and the precedent of other cases, it seems likely that a standard which actually promised to reduce the risk without unduly hampering the availability of the slides or decreasing their utility could render this risk "unreasonable." The question then is whether the specific provisions of the standard which Aqua Slide challenges have been shown to accomplish that task.

### A. *Warning signs*

■ Given the infrequency of the risk, it was incumbent upon the Institute and the Commission to produce evidence that the standard actually promised to reduce the risk. Instead, both the Institute and the Commission gave the matter short shrift. To begin with, the standard only applies to

new slides. It does not affect slides now in use, despite an Institute finding that "[t]here are many more slides in use than produced per year by a factor of ten to one." App. 781. *See* 16 C.F.R. § 1207.7(e) (signs must be made to allow retrofitting). It is odd that the Commission chose this limited method of addressing the risk rather than deciding to use its power to conduct a public education campaign, which could reach far more slide users. *See* §§ 2054, 2055; *National Ornament & Electric Light Christmas Ass'n, Inc. v.. Consumer Product Safety Commission,* 526 F.2d 1368 (2d Cir. 1975). A Red Cross representative told the Institute that its safety courses could inform 3,000,000 people a year of the risk of slide injury. App.1156.

Furthermore, the record contains only the most ambiguous of indications that the warning signs would actually be heeded by slide users. The Commission did not test the signs. App. 1601–1602. The only testing was done at the last minute by one Institute committee member, who conducted experiments for two days. The letter describing the tests, although it concluded that the signs "would seem capable of effecting significant risk reduction," also indicated that the test subjects "claimed they understood the belly slide message, but this seemed questionable," the message was "long," few readers "did more than glance" at it, and "[i]t should be cautioned that the signs will not be a strong countermeasure to unsafe acts, but of limited effectiveness." App. 790.

 The Commission rewrote the signs because of "a concern that the offeror's warning is not sufficiently strong to motivate safe use of the slides." App. 1350–1351. Even after it had rewritten the signs to make them more explicit, it considered the possibility that users would ignore the signs to be so strong as to justify encouraging placement of slides in deep water, despite increased risk of drowning. In the preamble to the proposed standard, it could do no more than say the signs "may achieve" a reduction in dangerous belly slides. 41 Fed.Reg. 2742, 2744. Certainly

the evidence of actual injuries bespeaks the kind of foolhardiness for which proper instructions would provide no cure. One accident victim had been drinking, and a jury apparently concluded he had hit a chair floating in a pool. App. 531. Another dove through a hoop. App. 546. Still a third went down a slide improperly installed in only three feet of water. App. 544. Another went down on his knees, App. 565, a position about which the proposed warning sign is silent. While Congress intended for injuries resulting from foreseeable misuse of a product to be counted in assessing risk, *see Kimble, supra,* at § 94, that does not warrant adoption of a standard which has not been shown to prevent misuse.

 To rebut this evidence, which raises serious questions about the efficacy of the warning signs, the Government cites only Institute discussions at which the Committee expressed their feelings that the signs would be a "positive step." App. 1137. *See* App. 1039, 1051–1053, 1131–1164. The actions of the Commission and the testing report provided the Institute, however, call these opinions into question. Further, while the Commission was entitled to reject the Institute signs, and adopt its own, it can do so only when the signs it adopts are supported by substantial evidence. *See Alterman Foods, Inc. v. FTC,* 497 F.2d 993, 999 (5th Cir. 1974). The issue here is not whether there is evidence to show that the Institute signs would be reasonable, but whether there is evidence to show that the Commission's signs are reasonably necessary. While it is no doubt rational to assume the warning signs would be heeded, mere rationality is not enough. The statute requires substantial evidence to support the Commission's ultimate conclusion that the signs are a reasonably necessary means of reducing an unreasonable risk. *See Forester, supra,* 182 U.S.App.D.C. at 168–169, 559 F.2d at 789–790 n.22. Unarticulated reliance on Commission "experience" may satisfy an "arbitrary, capricious" standard of review, *Consumers Union of United States, Inc. v. Consumer Product Safety Comm'n,* 491 F.2d 810, 812 (2d Cir. 1974),

but it does not add one jot to the record evidence. As indicated by Judge Wisdom's concurrence, the burden on the Commission to produce empirical evidence to show that the signs will work may be especially light when the group for whom the message is intended consists of first-time adult and teenage sliders. In the context of this case, however, the evidence in this record is slight.

In short, the Commission provided little evidence that the warning signs would benefit consumers. The risk is remote. The evidence that the signs would reduce the risk rests more on inference than it does on proof. In weighing the "reasonable necessity" for the signs, the crucial question then, is whether the benefit has a reasonable relationship to the disadvantages the sign requirement imposes.

In this case, the prime disadvantage to which Aqua Slide points is the warning's effect on the availability of the slides. Because the Commission did not test the signs, it provided little evidence of whether the signs were so explicit and shocking in their portrayal of the risk of paralysis as to constitute an unwarranted deterrent to the marketing of slides, and, hence, their availability to users. The record provides only scant assurance that purchasers would not be so alarmed by the warning signs that they would unnecessarily abstain. The signs do not indicate paralysis is a one in 10 million risk. The only evidence concerning the marketing impact the Commission's signs would have is a Commission staff report, based on the Battelle study. *See* App. 1687–1723. The Commission report was developed to satisfy a required statutory finding concerning the economic impact of the standard, § 2058(c)(1). It was based on interviews with persons active in the industry, however, and did not test the reaction of slide buyers.

The Commission report indicated 20 percent of total sales would be lost over six years. Perhaps as much as half of the 42 percent drop in slide sales from 1973 to 1974 could be attributed just to uncertainty about what the standard would say. App.

1695, 1712, 1714. The Commission apparently thought that, because, absent the standard, the industry was expected to grow each year by 51 percent, the net effect would be merely to slow the industry's rate of growth and harm investment. App. 1689, 1696, 1715. That conclusion, if supported by reliable evidence, would be beyond the power of this Court to disturb. In this case, however, the evidence on which the Commission relies was only made public after the period for public comment on the standard had closed. Consequently, critics had no realistic chance to rebut it. Once the comment period closed, the Commission had legal authority to promulgate the standard at any time. *See* 5 U.S.C.A. § 553(d). Neither Aqua Slide nor the public generally had much incentive to invest in the preparation of comments when the standard might become effective before the comments were submitted. In fact, Aqua Slide alleges the report is unreliable and has petitioned this Court for remand under § 2060(b) so it would have an opportunity to make its views known. The Commission's economic report constitutes the *only* record evidence concerning the economic impact of the standard. As such it is the "basic data" upon which the Commission relied. *See B. F. Goodrich Co. v. Department of Transportation*, 541 F.2d 1178, 1184 (6th Cir. 1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 773 (1977). It matters not that the late submission probably did not violate the notice requirement of 5 U.S.C.A. § 553. *See Ethyl Corp. v. EPA*, 176 U.S.App.D.C. 373, 541 F.2d 1 (1976) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). The statute requires that the Commission's findings be supported by substantial evidence, and that requirement is not met when the only evidence on a crucial finding is alleged to be unreliable and the Commission has not exposed it to the full public scrutiny which would encourage confidence in its accuracy. *Cf.* Note, *The Consumer Product Safety Commission: In Search of a Regulatory Pattern*, 12 Colum. J.L. & Soc.Prob. 393, 394 n.10 (1976) (public analysis impeded because "often [the Commission's] research is not done until just

prior to promulgation of the mandatory standard.")

Certainly, on this record, the economic finding is crucial. The only way to tell whether the relationship between the advantages and disadvantages of the signs is reasonable is to know exactly what those disadvantages are. Yet the Commission's study of the standard's economic impact lacks the indicia of reliability. At the same time, the proof that signs will significantly reduce the risk is weak. We consequently hold that the Commission has failed to provide substantial evidence to demonstrate the reasonable necessity of the warning signs. We set aside the warning sign requirement and the mandatory intended use instructions which repeat the warning, 16 C.F.R. § 1207.7.

B. *Ladder Chain*

The one aspect of the standard which does promise to reduce the risk of paraplegia is the placement of large slides in deep water. *See* 41 Fed.Reg. 2742, 2744. The Commission concluded it did not have jurisdiction over slide placement, so it included placement "recommendations" in the standard, and made them a part of the required intended use instructions. *See* 16 C.F.R. § 1207.6. Deep water placement, however, presented the Commission with an increased risk of child drownings.

The Commission thought the risk of drownings was so great that it "must be considered" in the standard. 41 Fed.Reg. 2742, 2745. The record supports that view. *See* App. 185, 658. One commercial pool owner reported a number of near-drownings when his slide was located in five feet of water, which stopped when he relocated the slide in shallower depths. App. 586–590. A member of the National Safety Council staff wrote a letter to the Institute urging it to take the risks of drowning into account. App. 629. Members of the committee reasoned that deep water slides, because of their playground analogies, would be an "attractive nuisance" to children. App. 914–915, 1133. *Cf. Cali v. United States*, 281 F.Supp. 411, 419 (S.D.N.Y.1968)

(complaint alleging injury on obstacle course slide states classic attractive nuisance claim). A standard that increased drownings would reduce slide utility, not enhance it, and would call into serious question the reasonable necessity for adopting the standard.

The Commission took two steps to reduce the risk of drowning associated with deep water slides. It redrew the warning sign to include a drowning figure, and it required all such slides to have a ladder chain. That warning sign, however, was never tested for effectiveness. The only tests performed on the ladder chain were done by Institute consultant Robert Weiner, who tried one out on his neighbors' children at a pool in his own back yard. App. 1023. The scant five pages of Institute committee discussion, which provides the only support for the chain cited by the Government, does not provide persuasive evidence that the chain would prevent children from using the slides. *See* App. 1022–1027. Weiner thought the chain would serve as a warning device, but he apparently did not think it would prevent a child from climbing the ladder. App. 1023, 1026. One Institute committee member, who had observed chains in use, said the chains would "create some difficulty." App. 1024. The Commission concluded the chain's presence "should, on balance, create a safer product." 41 Fed.Reg. 2742, 2747.

This is not the stuff of which substantial evidence is made. While expert opinion deserves to be heeded, it must be based on more than casual observation and speculation, particularly where a risk of fatal injury is being evaluated. If the chain were impossible to test, perhaps reliance on expert opinion alone would be sufficient. Here, however, the Commission conducted elaborate tests to show that deep water requirement would prevent paralysis, but it made no similar effort to prove the ladder chain would stop drownings. Also, the experts who provided the opinions were private consultants. While courts traditionally defer to the expertise of government regulatory agencies, the case for deference

is not as strong where the opinions of private individuals are concerned. An expert in water safety is not necessarily an expert in government regulation of private individuals, and may lack proper sensitivity to the limits the substantial evidence requirement places on government intrusion into the daily lives of the citizenry. Determining the best way to run your own swimming pool is not the same as deciding how the government should force your neighbor to run his. The *Forester* court, in rejecting the notion that a private industry safety standard could, by itself, provide sufficient support for a Commission regulation, said:

> While such private standards may tend to show the reasonableness of similar Commission standards, they do not prove the *need* for such provisions.

*Forester, supra,* 182 U.S.App.D.C. at 172, 559 F.2d at 793.

In this case the need is apparent but the assurance that the standard will work is not. The installation instructions create a risk of drowning. The Commission balanced that risk against a reduced likelihood of paraplegia if slides were placed in deep water. That balance, however, relied on the ability of the ladder chain and warning sign to mitigate the drowning risk. Because the Commission failed to produce substantial evidence to show the ladder chain and warning sign would work, its balance collapses and all of 16 C.F.R. § 1207.6 must be set aside.

### C. Conclusion

 In evaluating the "reasonable necessity" for a standard, the Commission has a duty to take a hard look, not only at the nature and severity of the risk, but also at the potential the standard has for reducing the severity or frequency of the injury, and the effect the standard would have on the utility, cost or availability of the product. In this case, the Commission neglected that duty. Aqua Slide has raised serious doubts about the warning sign and ladder chain requirements, their effectiveness, and their impact on the availability and utility of the slides. The Commission did not test

its warning signs. It did not establish that users would heed them and "belly slide" in the proper manner. It deprived the public of any meaningful chance to challenge its investigation into the possibility that the signs were so explicit in their mention of "paralysis" that they might unnecessarily frighten away those who would be willing to buy them if they knew how remote the risk actually was. The Commission has not adequately demonstrated the ability of the ladder chain to avert the serious danger of drowning that placing slides in deeper water would create. The Commission has failed to produce substantial evidence to support the warning sign and ladder chain requirements, and because those requirements are integral parts of the standard's scheme for preventing paralytic injury, §§ 1207.6 and 1207.7 must be set aside. The other sections of the standard will remain in effect.

In view of our disposition of this case, it is unnecessary for this Court to consider other issues, including the desirability of remand under § 2060 and the existence of the Commission's jurisdiction to require recommended installation instructions.

SET ASIDE IN PART.

WISDOM, Judge, concurring.

I concur in the disposition of this case. I disagree with the majority, however, on the reasons for invalidating that part of the regulation concerned with warning signs. Because I believe that the majority opinion will mislead the Commission as to the necessary evidentiary support for ordering warning signs, I must concur separately.

The majority makes two points about warning signs. First, it argues that there was not substantial evidence that warning signs would reduce the risk of paraplegia. Second, it urges that the Commission did not have substantial evidence with which to consider the marketing effects of its regulation.

As I read the record, there was substantial evidence to support a conclusion that warning signs would reduce the risk, although the majority says that the Commis-

sion was operating on an "untested theory". This theory was that some people will read and be affected by warning signs. When the group for whom the message is intended is first-time adult and teenage sliders, such a theory needs little, if any, empirical support to meet the substantial evidence standard. In this case the theory was supported, not only by the Commission, but by the National Swimming Pool Institute. The petitioner does not disagree. It has not pressed the question of the effectiveness of the signs; it questions only the relationship between the effectiveness and its economic cost. The changes the Commission made in the Institute's signs could only have strengthened them, as far as effectiveness is concerned.

Furthermore, there was a study made of the effectiveness of the Institute's signs. The majority properly notes that the researcher concluded that signs provided only a qualified benefit, but he did decide that they would be beneficial. His research dealt with children, rather than with the adults and teenagers at whom the Commission aimed its signs. That should make even stronger his conclusion that "they seem a desirable behavior modification device, but no panacea". App. 790.

The majority responds by pointing to evidence in the record that shows the signs will not solve the problem. Yet that evidence does not prove that signs will not work; it shows only that their effectiveness is limited. Of course, putting signs only on new slides will not be as effective as putting signs on all slides, but that does not mean it will be ineffective. Similarly, the fact that some sliders who have been injured would have disregarded the signs anyway does not demonstrate that the signs will not reduce the risk of injury; it shows only that they will not eliminate it. The Commission is not required to show that its solution will "solve" a problem, merely that it will reduce an unreasonable risk. It has produced substantial evidence that these warning signs will do so.

But the Commission is required to do more than determine whether there are any benefits to its regulation. Congress required it to consider the economic costs. In this case those costs are the effects on the manufacturers, and the effects on consumers who will be frightened away from purchasing pool slides. The Commission's determination that benefits exist is not the only conclusion that must be supported by substantial evidence. Most importantly, the balance the Commission draws between the benefits and the costs must have such support. This is the argument pressed by Aqua Slide. The benefits from these signs have no reasonable relationship to the costs they will impose. For the reasons so ably stated by Judge Roney, I agree that the cost analysis done by the Commission is not entitled to consideration. These signs are not so innocuous as to be presumed "inexpensive". With no evidence on the cost side of the ledger, the Commission's cost-benefit analysis is without substantial evidence for support. Therefore, the case should be returned to the Commission. The Commission should act on better evidence of the economic impact to meet the requirements of this Act.[1]

---

1. The Commission may also wish to supplement its findings concerning the effectiveness of the warning signs. Although I feel that the signs are sufficiently supported to survive the substantial evidence test, the evidence of their effectiveness in this record falls far short of being overwhelming.